UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued January 6, 2006
Decided March 14, 2006

**Before**

Hon. FRANK H. EASTERBROOK, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 05-1093

Administrator of the Estate of
Fernando Mendez,
            *Plaintiff-Appellant,*

    *v.*

City of Chicago,
            *Defendant-Appellee.*

Appeal from the United States
District Court for the Northern
District of Illinois, Eastern Division

No. 03 C 8182

Samuel Der-Yeghiayan, *Judge*

**O R D E R**

Fernando Mendez sued the City of Chicago for disability discrimination and failure to accommodate his disability under the Americans with Disability Act.  The district court granted the City summary judgment.  Mendez appeals.[1]  We affirm.

---

[1] After filing his notice of appeal but before oral argument, Mendez died.  This court granted a motion to substitute his estate on January 17, 2006.

I.

Fernando Mendez began working for the City of Chicago in May of 1975, as a garbage collector. After he fell and injured his knee, the City placed Mendez on "duty disability" from September of 1993 until February of 1997. During this time, Mendez also suffered a respiratory illness and underwent a tracheostomy. Mendez returned to work in February of 1997, and the City assigned him to watchman duty at a storage garage for garbage trucks located on Kedzie Avenue, initially working the night shift.

Mendez suffered another illness in November of 1997 and underwent another tracheostomy. In November of 1999, Mendez submitted a doctor's note stating that it was "necessary on medical grounds" that Mendez "stop working nightshifts." Mendez, however, agreed to work the night shift at that time because no day shift position was available. Mendez took another medical leave of absence in October of 2000. When Mendez returned to work in December, he presented the City with a letter from another doctor stating that he could only work the day shift because he "cannot be alone in case of an emergency" and "cannot endure cold night temperatures if he has to step out, all due to Chronic Lung Disease and his permanent Tracheostomy Tube." On December 13, 2000, the day after Mendez filed a failure to accommodate charge with the Equal Employment Opportunity Commission ("EEOC"), the City granted Mendez's request to move to the day shift.

Over the next year, Mendez filed two complaints about the conditions in the garage with the Illinois Department of Labor, claiming the working conditions at the Kedzie garage violated the Illinois Health and Safety Act. The IDOL visited the garage and issued two citations.[2] On the date that IDOL issued its second citation, July 25, 2001, the City granted Mendez a further accommodation—allowing him to sit in a construction site trailer behind the garage when he was not making rounds. Mendez continued to complain about the garage conditions, causing the IDOL to issue an additional citation. Then in February 2002, Mendez asked for yet another accommodation—he asked not to work in the garage at all, submitting a letter from Dr. Bozzano who wrote that Mendez could no longer work in the Kedzie garage. Nonetheless, according to Mendez, the City continued to require him to patrol inside the garage. On March 8, 2002, Mendez presented the City with yet another doctor's note, again requesting not to patrol inside the garage.

---

[2] The warning citations mentioned pigeon droppings and noxious fumes in the garage, stating that those items "can be hazardous to breathe."

A few weeks later, upon a further complaint from Mendez, the IDOL returned to the garage, and, on March 25, 2002, fined the City $10,000 for "wilful repeat violations." Later that same day, three senior City officials inspected the Kedzie garage. During this inspection, the Deputy Commissioner of the Department of General Services, James Chronis, saw Mendez using his car to patrol the premises. He asked Charles Hollinger, the City's Director of Security, why Mendez was driving. Hollinger responded that he did not know and that Mendez should not be doing so. Hollinger approached Mendez and asked him why he was driving on his rounds. Mendez explained that he had been using the vehicle to make his rounds for years and that his superior had allowed him to do so. Mendez further told Hollinger that he still got out of the car to investigate areas where his vehicle would not fit and to check doors and windows.

After discovering Mendez driving his rounds, Hollinger initiated disciplinary proceedings against Mendez. At a predisciplinary hearing held in April 2002, Mendez informed the City that he had been driving his rounds for five years and that he could not walk the entire area because of health problems. While he could drive on rounds, Mendez also testified that he could not drive long distances to work at other locations that might have a healthier environment. Based on Mendez's testimony, the City directed him to submit to a medical examination. The City's doctor found Mendez unfit for duty and placed him on medical leave.

Mendez responded by filing a charge of disability discrimination with the EEOC on January 10, 2003. After the EEOC issued a right to sue letter, Mendez filed a two-count complaint against the City under the Americans with Disability Act, 42 U.S.C. §§ 12101 et. seq., ("ADA"). Count I alleged the City violated the ADA by refusing to grant his request for an accommodation—namely his request not to work in the Kedzie garage. Count II alleged that the City discriminated against him on the basis of his disability by requiring him to undergo a physical examination. The district court granted the City summary judgment, holding that Mendez was not a qualified individual with a disability because he could not perform the essential job functions of a watchman. The district court alternatively held that Mendez's failure to accommodate claim was time-barred because he did not file his EEOC charge within 300 days of the City's denial of his accommodation request. Finally, the district court held that Mendez failed to present evidence that a non-disabled individual was treated more favorably and, therefore, his discrimination claim failed. Mendez appeals.

II.

On appeal, Mendez first asserts that the district court erred in holding that he failed to file a complaint with the EEOC within 300 days of being denied an accommodation. *See EEOC v. Harvey L. Walner & Assoc.*, 91 F.3d 963, 970 (7th Cir. 1996) ("Illinois is a 'deferral state,' and so the limitation period runs for 300 days from the date of the alleged discrimination."). Mendez filed his EEOC charge on January 10, 2003, which means that only claims based on conduct occurring on or after March 16, 2002, are timely.

In this case, in February of 2002, and again on March 8, 2002, Mendez requested as an accommodation that he not be required to patrol the interior of the Kedzie garage. The City claims that after receiving a note from Mendez's doctor, stating that Mendez could no longer work inside the Kedzie garage, it accommodated that request. Specifically, the City claims that it told Mendez, who had earlier been allowed to sit in a trailer behind the garage, that he did not have to patrol inside the garage, but instead needed to only patrol the Department of Forestry land behind the Kedzie garage. Conversely, Mendez claims that after providing the City with his latest request for an accommodation, the City, while allowing him to work out of the trailer, still required him to make hourly rounds in the Kedzie garage.

The conflicting factual accounts are immaterial because under either view, as discussed below, Mendez loses. However, it does make the analysis more detailed, because depending on the view of the facts, Mendez loses for different reasons. Under Mendez's version of the facts, Mendez loses for two reasons. First, if in response to his request not to patrol in the garage, the City continued to require him to work in the garage, that decision occurred in February 2002, and thus his EEOC claim was untimely.[3]

Second, if, as Mendez claims, the City continued to require him to patrol the garage, then he loses because he is not a qualified individual with a disability. "Qualified individual with a disability" is defined by the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To assess whether Mendez was a qualified

---

[3] Mendez attempts to avoid this conclusion by arguing that the City had not denied his request for an accommodation, but instead had yet to act on it. Mendez, however, testified in his deposition that after providing the City with his doctor's note, the City still required him to make rounds. There is no evidence in the record that the City in any way indicated that it was still considering his request.

individual with a disability, then, we consider the essential functions of a watchman. Mendez bears the burden of presenting sufficient evidence from which a reasonable jury could find that he is a qualified individual with a disability. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1284 (7th Cir. 1996).

"To determine whether a job function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)). Here, Mendez worked for the City as a watchman at the Kedzie street location. The City has a written description for the job of watchman that lists both the major duties and desirable qualifications for this position. The major duties listed for watchman are very detailed. They include patrolling buildings and assigned areas, detecting and investigating any unusual conditions, preventing unlawful or unauthorized entry into buildings or grounds, providing first aid and summoning medical assistance in the event of an accident, and making assigned tours of the premises to prevent and detect hazardous and dangerous conditions. The assigned areas at the Kedzie street location include both the exterior and interior of the garage. After Mendez's doctor stated that he could not patrol in the garage, Mendez sought an accommodation that would allow him to continue as a watchman without patrolling the garage. However, given that the major duties of a watchman include patrolling *all* assigned areas, Mendez could not perform the essential functions of a watchman at that location. If the City had agreed that Mendez could remain at the Kedzie location without patrolling the garage, then that *could* indicate that patrolling the garage was not an essential job function. Mendez, however, claims that the City never took such a position. In addition to Mendez's testimony that the City required him to patrol the garage, he cites the notices posted throughout the Kedzie facility reminding watchmen to patrol the entire grounds every hour, and the job description that required watchmen to patrol all assigned areas. Thus, based on the record before us, patrolling the Kedzie garage constituted an essential job function, which Mendez undisputedly cannot perform.

On appeal, Mendez and the City spend a great deal of time addressing a different question–whether patrolling the garage *on foot* is an essential job function. Before the district court, the City had argued it was. In support of its position, the City presented the affidavit of Charles Hollinger, the Director of Security for the Department of General Services: "The City expects watchmen to physically check gates and other access points to make sure a facility is secure, and to patrol the entire facility by foot to make sure no one trespasses onto facility grounds." Mendez countered by pointing out that the job description does not indicate that a watchman must patrol his assigned areas by foot. Mendez further argued that the City's practice of allowing guards to patrol by automobile demonstrates patrolling the area by foot was not an essential function of the job. To support this claim, Mendez cited to his testimony that he worked as a watchman for five years while

patrolling the garage in his car, exiting to check doors and areas where he could not drive. He further maintained that his superior allowed him to use his car to patrol. Mendez also cited declarations from two other watchmen who also worked at the Kedzie garage, who stated that they also used automobiles to patrol the garage from "time to time" and that their foremen knew about it and did not disapprove. After the City objected to the phrase "from time to time," Mendez filed for leave to provide more detailed declarations and also to present a declaration from a third watchman who stated that he always used his car to patrol the Kedzie location. The district court denied Mendez's request to supplement the record, which denial Mendez also claimed as error.

We need not enter this fray, however, because whether patrolling the garage on foot is an essential job function is immaterial because Mendez's physical disabilities prevented him from performing the other functions of watchman. Specifically, Mendez's doctor stated that his disabilities prevented him from working in a garage where there were diesel fumes. As noted above, however, the major duties listed for watchman include "patrolling buildings and assigned areas," and "making assigned tours of the premises to prevent and detect hazardous and danger conditions." The assigned areas for the Kedzie street location include the interior of the Kedzie garage, where the coming and going of garbage trucks caused an accumulation of diesel fumes. Given Mendez's disability and his inability to *safely* patrol inside the garage, Mendez cannot perform the essential functions at the Kedzie location. *See Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005) (holding that an individual is not a qualified individual with a disability under the ADA if he presents a direct threat to his own health and safety).

Moreover, even if the City allowed Mendez to patrol only the exterior of the garage, a watchman must also "investigat[e] any unusual conditions, preventing unlawful or unauthorized entry into buildings or grounds . . . ." To investigate disturbances would require Mendez at times to enter the garage. Additionally, even if Mendez could patrol by car, to properly investigate unusual conditions, both inside and outside the garage, Mendez would have to leave his car and follow-up on foot. Yet the record shows that Mendez ability to do so was severely limited because his disabilities (his respiratory injury, his leg injury, and obesity) prevented him from walking more than one or two blocks. In fact, in his deposition, Mendez testified that "with this stupid tool in my neck–I can barely breathe now, sitting down. . . ."

Furthermore, Mendez's doctors testified that he must not work alone in case of a medical emergency, yet Mendez testified in his deposition that following budget cuts, 95% of the time he was the only one on the whole Kedzie street premises. Although we sympathize with the situation Mendez faced prior to his death, it is unreasonable to require the City to hire another employee to watch the watchman to assure he has no health crisis. Finally, Mendez's doctors state that he cannot

drive long distances and Mendez admitted that he cannot substitute at the O'Hare location as needed. The City stated that it considers it an essential function to substitute for other watchmen, and on appeal Mendez failed to develop any argument disputing that assertion. In short, Mendez's extensive disabilities and the limitations, to which his doctors attested, show that he cannot perform the essential job functions of a watchman at the Kedzie location, with or without a reasonable accommodation. Aside from the fact that he could not drive any long distance, there were no other day-time[4] vacancies for watchmen at other locations, and the ADA does not require an employer to bump another employee. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). Therefore, Mendez could not perform the essential job functions.

Alternatively, Mendez attempted to overcome this conclusion by arguing that the City is judicially estopped from claiming that he cannot perform all essential job functions because the City maintained before the EEOC in April 2001 that Mendez was a qualified individual with a disability. "Judicial estoppel provides that when a party prevails on one legal or factual ground in a lawsuit, that party cannot later repudiate that ground in subsequent litigation based on the underlying facts." *Urbania v. Cent. States, S.E. and S.W. Areas Pension Fund*, 421 F.3d 580, 589 (7th Cir. 2005). For judicial estoppel to apply, three requirements must be met: (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position." *Id.* These requirements are not met here because the facts at issue now are not the same as those before the EEOC in April 2001. Specifically, it was not until February and March 2002, that Mendez's doctors informed the City that Mendez could no longer work in the garage. There was no such limitation on Mendez's abilities present at the time of the April 2001 EEOC complaint. Accordingly, the City is not judicially estopped from now maintaining that Mendez was not a qualified individual with a disability.

As detailed above, Mendez is not a qualified individual with a disability. Because "[t]he protections of the ADA extend only to 'qualified individuals' with a disability," *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005), Mendez could not succeed on his failure to accommodate or his disability discrimination claims. We therefore need not address the district court's alternative holding–that Mendez failed to present evidence that a similarly situated non-disabled individual was treated more favorably.

Before closing, we also note that in his brief, Mendez alternatively referred to his firing as disability discrimination and retaliation; Mendez's complaint, however,

---

[4] As explained above, according to his doctors, Mendez's condition also necessitated a day-time shift.

failed to allege a retaliation claim.  He also failed to develop the retaliation claim on appeal, instead conclusively stating that the City retaliated against him for complaining about the condition of the garage to the Department of Labor.  Besides having waived this issue by failing to develop it, Mendez misunderstood the anti-retaliation provision of the ADA.  The ADA only prohibits retaliation for opposing or complaining about disability discrimination.  *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001) (explaining that "[t]he ADA's retaliation provision prohibits employers from 'discriminat[ing] against any individual because [he] has opposed any act or practice made *unlawful by [the ADA]* or . . . has made a charge [under the ADA].'" (quoting 42 U.S.C. § 12203(a)) (emphasis added)).  Complaining to the Illinois Department of Labor about the conditions of the garage is not statutorily protected activity under the ADA.  Therefore, Mendez's retaliation claim under the ADA would fail in any event.  *Cf. Wiehoff v. GTE Directories, Corp.*, 61 F.3d 588, 598 (8th Cir. 1995) (holding that plaintiff's ADEA retaliation claim failed because the plaintiff complained about "charge-backs" and not age discrimination).

## III.

Mendez's multiple physical disabilities limited his ability to work as a watchman at the Kedzie street location.  Although the City originally succeeded in accommodating Mendez's disabilities, as Mendez's condition worsened and the doctors' limitations expanded, he eventually became unable to perform, with or without an accommodation, the essential job functions of a watchman.  Therefore, Mendez was not protected under the ADA.  Accordingly, the district court properly granted the City summary judgment on Mendez's failure to accommodate and discrimination claims.  We AFFIRM.